FILED
2016 Oct-24  AM 09:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **TRISTAN J. TINNON,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  4:15-CV-555-MHH** |
| | } | |
| **CAROLYN W. COLVIN,** | } | |
| **Commissioner of the** | } | |
| **Social Security Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), plaintiff Tristan Jacob Tinnon seeks judicial review of a final adverse decision of the Commissioner of Social Security.  The Commissioner denied Mr. Tinnon's claims for a period of disability, disability insurance benefits, and supplemental security income.  After careful review, the Court affirms the Commissioner's decision.

## I.    PROCEDURAL HISTORY

Mr. Tinnon applied for a period of disability, disability insurance benefits, and supplemental security income on January 8, 2014.  (Doc. 7-6, pp. 2-14).  Mr. Tinnon alleges that his disability began on August 27, 2013 due to bipolar disorder, manic depression, suicidal thoughts, and dyscalculia.  (Doc. 7-6, p. 2, 8; Doc. 7-7,

p. 3).  The Commissioner initially denied Mr. Tinnon's claims on March 20, 2014. (Doc. 7-5, pp. 3-6).  Mr. Tinnon then requested a hearing before an Administrative Law Judge (ALJ).  (Doc. 7-5, pp. 9-11).  The ALJ held a hearing on July 31, 2014. (Doc. 7-3, pp. 45-87).  The ALJ issued an unfavorable decision on October 3, 2014.  (Doc. 7-3, pp. 11-30).  On January 26, 2015, the Appeals Council declined Mr. Tinnon's request for review (Doc. 7-3, pp. 2-7), making the Commissioner's decision final and a proper candidate for this Court's judicial review.  *See* 42 U.S.C. § 405(g), § 1383(c).

## II.   STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In evaluating the administrative record, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment

for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r of Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III.   SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

In this case, the ALJ found that Mr. Tinnon has not engaged in substantial gainful activity since August 27, 2013, the alleged onset date.  (Doc. 7-3, p. 16).  The ALJ determined that Mr. Tinnon suffers from the following severe impairments:  bipolar disorder, mixed type; attention deficit hyperactivity disorder (ADHD); alcohol dependence in remission; and Ehlers Danlos syndrome, by history.  (Doc. 7-3, p. 16).  Based on a review of the medical evidence, the ALJ concluded that Mr. Tinnon does not have an impairment or a combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Doc. 7-3, p. 17).

In light of Mr. Tinnon's impairments, the ALJ evaluated Mr. Tinnon's residual functional capacity.  The ALJ determined that Mr. Tinnon has the RFC to perform:

> light work, as defined as 20 C.F.R. 404.1567(b), 416.967(b) except the claimant could never climb ladders or scaffolds; the claimant could never be exposed to unprotected heights, dangerous tools, dangerous machinery, or hazardous processes; the claimant should never operate commercial motor vehicles; the claimant could tolerate moderate noise levels in the workplace; the claimant would be limited to simple tasks and simple work-related decisions; the claimant could maintain frequent interaction with supervisors and coworkers but only occasional interaction with the general public; the claimant could remember short, simple instructions but would be unable to deal with detailed or complex instructions; the claimant could do simple, routine tasks but would be unable to do detailed or complex tasks; the claimant would not be able to perform assembly line work with a production rate pace but could perform other goal oriented work; in

addition to normal breaks, the claimant would be expected to be off task approximately 5% of an 8-hour workday (non-consecutive minutes); the claimant would need an at will sit/stand option with the retained ability to stay at or on a workstation in no less than 30 minute increments each without significant reduction in remaining on task; the claimant could also ambulate short distances of up to 100 yards per instance on flat, hard surfaces.

(Doc. 7-3, p. 20).

Based on this RFC, the ALJ concluded that Mr. Tinnon is not able to perform his past relevant work as a telephone order clerk, raft river/tour guide, adult education instructor, sales clerk, short order cook, or conveyor feeder.  (Doc. 7-3, p. 23).  Relying on testimony from a vocational expert, the ALJ found that jobs exist in the national economy that Mr. Tinnon could perform, including parking lot cashier, storage facility rental clerk, and cafeteria checker.  (Doc. 7-3, p. 24).  Accordingly, the ALJ determined that Mr. Tinnon has not been under a disability within the meaning of the Social Security Act.  (Doc. 7-3, p. 25).

## IV.   ANALYSIS

Mr. Tinnon argues that he is entitled to relief from the ALJ's decision because the ALJ failed to accord proper weight to the opinion of Dr. Elizabeth Lachman, Mr. Tinnon's treating psychiatrist.  Mr. Tinnon also argues that the ALJ erroneously concluded that he (Mr. Tinnon) does not meet Listing 12.04.  The Court examines each issue in turn.

### A.    The ALJ Gave Proper Weight to the Opinion of Mr. Tinnon's Treating Psychiatrist.

5

An ALJ must give considerable weight to the opinion of a treating psychiatrist like Dr. Lachman if the evidence in the administrative record supports the opinion, and the opinion is consistent with the doctor's own records. *See Winschel*, 631 F.3d at 1179. An ALJ may refuse to give the opinion of a treating psychiatrist "substantial or considerable weight . . . [if] 'good cause' is shown to the contrary." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). Good cause exists when "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) [the] evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Id.* at 1240-41; *see also Crawford*, 363 F.3d at 1159. The ALJ "must state with particularity the weight given to different medical opinions and the reasons therefor." *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 931 (11th Cir. 2013) (internal quotation and citation omitted).

In support of his claim for disability benefits, Mr. Tinnon relies on a mental health source statement that Dr. Lachman completed in June 2014. (Doc. 7-13, p. 28). Dr. Lachman circled "Yes" or "No" to the questions on the form. The mental health statement is a pre-printed form. Through her responses on the form, Dr. Lachman indicated that Mr. Tinnon can understand, remember, or carry out very short and simple instructions and maintain attention, concentration, and/or pace for periods of at least two hours. (Doc. 7-13, p. 28). Dr. Lachman also reported that

Mr. Tinnon cannot perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; accept instructions and respond appropriately to criticism from supervisors; or maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (Doc. 7-13, p. 28).

The ALJ gave Dr. Lachman's opinion little weight because "[t]he extreme limitations noted by Dr. Lachman are not supported by her treatment notes, the consultative evaluations, and the evidence showing the effectiveness of [Mr. Tinnon's] medications."  (Doc. 7-3, p. 23).

Dr. Lachman's treatment notes and notes written by others who worked with Dr. Lachman at Quality of Life Health Services are consistent with the health source statement opinion that Dr. Lachman completed, but those records indicate that Mr. Tinnon is able to function adequately when he takes his prescription medication properly.

The relevant records date from March 2012.  When Mr. Tinnon first visited Quality of Life Health Services on March 26, 2012, he met with Dr. Muhammad Tariq.  (Doc. 7-10, pp. 48-50).  Mr. Tinnon reported that he was taking Vyvanse and Depakote for bipolar disorder and ADD.  (Doc. 7-10, p. 48).  Dr. Tariq indicated that Mr. Tinnon did not suffer from anxiety and depression, and Mr. Tinnon demonstrated the "appropriate mood and affect."  (Doc. 7-10, pp. 49-50).

Dr. Tariq diagnosed bipolar disorder.  He gave Mr. Tinnon a refill prescription for 60mg Vyvanse capsule and Divalproex ER 250mg.  (Doc. 7-10, p. 50).

Mr. Tinnon next met with Dr. Tariq on May 4, 2012.  (Doc. 7-10, p. 45). Mr. Tinnon presented with bipolar disorder and ADD.  (Doc. 7-10, p. 45).  Dr. Tariq once again rated Mr. Tinnon as "[n]egative for anxiety and depression." (Doc. 7-10, p. 46).  Dr. Tariq renewed Mr. Tinnon's prescription for Divalproex ER 250mg and Vyvanse 60mg capsule.  (Doc. 7-10, p. 47).

Mr. Tinnon met with Dr. Tariq again on December 10, 2012.  (Doc. 7-10, p. 41).  Again, Dr. Tariq indicated that Mr. Tinnon was "[n]egative for anxiety, compulsive thoughts or behaviors, decreased sleep, depressed mood, depression, and suicidal ideation[.]"  (Doc. 7-10, p. 42).  However, Dr. Tariq found that Mr. Tinnon had "difficulty concentrating," he was "easily startled," and he suffered from "hopelessness."  (Doc. 7-10, p. 42).

When Mr. Tinnon visited Quality of Life Health Services again on January 23, 2013, counselor and social worker Dave Harvey performed a psychiatric evaluation.  (Doc. 7-10, p. 38).  Mr. Harvey noted that Mr. Tinnon "need[ed] close monitoring or medications via Dr. Lachman" and "[Mr. Tinnon] is in need of Vyvan[s]e because he is bona fide ADHD."  (Doc. 7-10, p. 38).  Mr. Harvey also remarked that Mr. Tinnon "does not express suicidal ideation" or "homicidal

ideation," but his "self-perception is abasing." (Doc. 7-10, p. 39). Mr. Tinnon had a GAF of 50. (Doc. 7-10, p. 39).

Five days later, on January 28, 2013, Mr. Tinnon met with Dr. Tariq. Mr. Tinnon requested medication refills. (Doc. 7-10, p. 35). This time, Dr. Tariq found Mr. Tinnon positive for anxiety and negative for depression. (Doc. 7-10, p. 36). During the January 28, 2013 visit with Dr. Tariq, Dr. Tariq stated that he would like Dr. Lachman to see Mr. Tinnon. (Doc. 7-10, p. 37).

On February 20, 2013, Mr. Tinnon saw Mr. Harvey again. (Doc. 7-10, p. 33). Mr. Harvey noted that Mr. Tinnon "was much different . . . focused, organized, and much more relaxed. He reported people at work noticed the change. He completed his work assignments, was courteous to his customers and patient. His supervisor called him in and complimented him on his work. Very good progress." (Doc. 7-10, p. 34).

On March 11, 2013, Mr. Tinnon saw Dr. Tariq. Mr. Tinnon complained of ankle pain and requested medication refills. (Doc. 7-10, p. 29). Mr. Tinnon said he fell down as he tried to get out of his bed, "sprained his ankle, busted his lips, and injured [the right] side of face." (Doc. 7-10, p. 29). Dr. Tariq reported that Mr. Tinnon was not suffering from anxiety or depression. (Doc. 7-10, p. 30). Dr. Tariq referred Mr. Tinnon for an X-ray. (Doc. 7-10, p. 32).

On March 27, 2013, Mr. Tinnon met with Mr. Harvey again.  (Doc. 7-10, p. 27).  Mr. Harvey noted that "[Mr. Tinnon] is looking for a job.  Has an interview at Sears today.  Doing much better focusing.  Feels Dr. T[ariq] is uncomfortable prescribing these medications.  Dr. Lachman will take his case over . . . He is writing his novel.  Very intelligent, good sense of humor but very much a nerd.  Good rapport."  (Doc. 7-10, p. 28).  Mr. Harvey reported that Mr. Tinnon was distractible and unable to "follow complex directions" and had "memory deficits." (Doc. 7-10, p. 28).  Mr. Harvey set a goal for Mr. Tinnon to "compensate" for these "cognitive limitations" by July 2013.  (Doc. 7-10, p. 28).

On April 17, 2013, Mr. Tinnon met with Dr. Tariq.  Mr. Tinnon reported a "decreased need for sleep, difficulty concentrating . . . and racing thoughts but denied anxious/fearful thoughts, compulsive thoughts or thoughts of death or suicide."  (Doc. 7-10, pp. 23-25).  Mr. Tinnon's memory was intact, and he was oriented to time, place, person, and situation.  (Doc. 7-10, p. 25).  Dr. Tariq stated that Mr. Tinnon was not experiencing anxiety, compulsive thoughts or behaviors, depression, or suicidal ideation.  (Doc. 7-10, p. 25).

On May 7, 2013, Mr. Tinnon met with Mr. Harvey.  (Doc. 7-10, p. 21). During that meeting, Mr. Harvey reported that Mr. Tinnon had not stopped taking any of his medicines and "doesn't want to."  (Doc. 7-10, p. 22).  Mr. Tinnon told Mr. Harvey that he may have found a job, and Mr. Tinnon wanted "to make sure

his condition is not worsening." (Doc. 7-10, p. 22). Mr. Tinnon reported he was sleeping much better, and "his focus and concentration are very much improved on the Vyvan[s]e." (Doc. 7-10, p. 22).

Mr. Tinnon next saw Mr. Harvey on July 1, 2013. (Doc. 7-10, p. 17). Mr. Harvey noted that Mr. Tinnon had been hospitalized about two weeks prior to the visit. (Doc. 7-10, p. 18; *see* Doc. 7-9, pp. 58-65). Before the hospitalization, Mr. Tinnon had not been taking his medication for about a month because he "did not like how [they] made him feel," and he did not believe the prescription medications were helping him. (Doc. 7-9, p. 58). Mr. Harvey reported that Mr. Tinnon had had severe panic attacks for three days, "became dehydrated, felt like there was sand in his mouth, and had severe sodium depletion." (Doc. 7-10, p. 18). Mr. Harvey noted that Mr. Tinnon reported "he is doing better but feels a bit 'dopey' but 'centered.'" (Doc. 7-10, p. 18). Mr. Tinnon stated that he felt like his Neurontin was working well. (Doc. 7-10, p. 18).

Mr. Tinnon saw Dr. Lachman for the first time on August 12, 2013, per Mr. Harvey's referral. (Doc. 7-10, p. 13). Under the "History of Present Illness" section of the medical record, Dr. Lachman wrote:

> This is a fairly interesting interview and evaluation because the patient [] is expansive, his speech is rapid, not pressured. Labile. For example, he explains to me what syclothymia is, but he is no where [sic] near accurate in his description.

The patient makes a point that he [ha]s a pharmacological background.  Was a licensed pharmaceutical rep for a while, but he did not work in the field, because he did "not look good in [a] skirt and heels.  He really only did a course on line.  Guys that walk [on] stilts and looked like they came from a [V]iagra ad.  Look at me.  Short with crazy hair."  The patient worked at Office Max.  Their top sales consultant for district 22.  Constantly got compliments.  Now works "at a chicken plant with two Masters' degrees.  Works with a bunch of moon[ers], stoners, and meth heads . . . I hate it."  The patient has been at the chicken plant x 3 weeks.  He has already been in trouble.  Several times.  He was on the Adderall XR x years.  Finally had Vyvanse.  But off Vyvanse x 2 months until he could get to me.  But he has already been written up 6 times in 3 weeks at work.  Lots of occupational impairment because of it.

On Adderall, he went from a mediocre student to a President's Cum Laude student.  The patient recently discovered that his sleep patterns are all screwed up when he is off Ambien.  The Ambien does help.  He does not have any weird side effects, he seems to get refreshing sleep.

(Doc. 7-10, p. 13).  Dr. Lachman stated that Mr. Tinnon initially received treatment for mental issues in second grade.  He was on Ritalin but not for long.  Ritalin "had an adverse effect as an adult," but "Adderall helped."  (Doc. 7-10, p. 13).  Dr. Lachman noted that Mr. Tinnon has never attempted suicide.  Mr. Tinnon engaged in "irrational, expansive [] ramblings."  (Doc. 7-10, p. 14).

Under the "Biopyschosocial Summary" portion of her report, Dr. Lachman stated that Mr. Tinnon was "[w]ritten up at work for not paying attention.  Not knowing that he missed 30 chickens, playing with something else.  Severe inattentiveness.  Easy distractibility.  Disorganization.  Needs to be back on his Vyvanse. . . .  Does not appear to be med seeking."  (Doc. 7-10, p. 15).

Dr. Lachman diagnosed mixed, chronic bi-polar disorder and ADHD. (Doc. 7-10, p. 15). In addition to Vyvanse, Dr. Lachman prescribed Tegretol, Neurontin, Carbamazepine, and Ambien. (Doc. 7-10, pp. 15-16).

On August 13, 2013, one day after his visit with Dr. Lachman, Mr. Tinnon met with Mr. Harvey. (Doc. 7-10, p. 11). Mr. Harvey explained that Mr. Tinnon was:

> better today, more focused with a good sense of humor. Taking his Vy[v]an[s]e again which helps. Saw Dr. L[achman] recently. Rambled on today about his experience in working with the chicken plant. Has had some problems out there. Trying to get disability but has been denied twice. . . . Talkative, a comedian today.

(Doc. 7-10, p. 12). Mr. Harvey explained that Mr. Tinnon's treatment would focus on "medication management because counseling will have little or no impact on" his problems. (Doc. 7-10, p. 12).

On September 17, 2013, Mr. Tinnon saw Mr. Harvey again. (Doc. 7-10, p. 9). Mr. Tinnon was no longer working at the chicken plant because he "[h]ad physical pain in his hands from handling the chickens." (Doc. 7-10, p. 10). Mr. Tinnon reported that "[i]nteracting with people on their level [was] a real problem." (Doc. 7-10, p. 10). Mr. Harvey noted that Mr. Tinnon "cannot keep a job. Very intellectual and nerdish. Inappropriate at times and has poor perception. . . [Mr. Tinnon] has a very high IQ but is also very immature and doesn't fit in almost any setting." (Doc. 7-10, p. 10). Mr. Harvey also explained that "[Mr.

Tinnon] is doing better as he is much more pleasant and has a good sense of humor." (Doc. 7-10, p. 10). Mr. Harvey stated that Mr. Tinnon was talkative and relaxed during their session. (Doc. 7-10, p. 10). Mr. Harvey set as a new goal for Mr. Tinnon compensation for his cognitive limitations by December 2013. (Doc. 7-10, p. 10).

On October 22, 2013, when Mr. Tinnon met with Mr. Harvey, Mr. Harvey noted that he saw no change in Mr. Tinnon's mental state. (Doc. 7-10, p. 7). Mr. Tinnon reported that one of his medications was helping him, and he had not had "major problems." (Doc. 7-10, p. 8). Mr. Tinnon reported that he was working as a sitter for his grandmother. (Doc. 7-10, p. 8).

On December 2, 2013, Mr. Tinnon met with Dr. Lachman for a second time. (Doc. 7-10, pp. 5-6). During that visit, Dr. Lachman noted that Mr. Tinnon was experiencing anxiety, that he was "not able to pay attention too long," that he was disheveled, and that he was "sleeping more than he should." (Doc. 7-10, pp. 5-6). Mr. Tinnon reported that he was "taking a down turn." (Doc. 7-10, p. 6). Dr. Lachman's clinical assessment was: "Bipolar, Mixed, Chronic [and] ADHD NOS." (Doc. 7-10, p. 6). Dr. Lachman also noted that Mr. Tinnon was experiencing problems related to accessing health care, finances, occupation, and "primary support group." (Doc. 7-10, p. 6). Mr. Tinnon was still working for his grandmother. (Doc. 7-10, p. 6).

The next day, December 3, 2013, Mr. Tinnon reported to Gadsden Regional Medical Center for a drug overdose. Mr. Tinnon "took approximately 10 Tegretol not in a suicide attempt but to calm his level of anxiety down." (Doc. 7-9, p. 102). Mr. Tinnon reported that "he ha[d] been stabilized on Tegretol 400 mg b.i.d from Dr. Lachman," but prior to admission, Mr. Tinnon "had an increased level of anxiety to where he pace[d], ha[d] increased worry, and ha[d] difficulty shutting his mind down." (Doc. 7-9, p. 102). Doctors determined that Mr. Tinnon required hospitalization for an "unintentional overdose [] and medication monitoring for Tegretol level which could be dangerous as an outpatient." (Doc. 7-9, p. 103). Admission notes state that:

> [Mr. Tinnon]'s [s]peech is hyperverbal. Behavior is bizarre, withdrawn with inappropriate laughter at times. Motor, no psychomotor agitation or retardation. Mood and affect are labile. Thought process is overly inclusive with grandiose themes. Thought content, no auditory or visual hallucinations. No suicidal or homicidal ideation. Insight is fair. Judgment is poor. He is alert and oriented x4.

(Doc. 7-9, p. 102).

Mr. Tinnon was stabilized on medication and discharged six days later. (Doc. 7-9, pp. 100-101). Mr. Tinnon's discharge report states:

> The patient was admitted to Psychiatry. His Tegretol level was checked and he was restarted on Tegretol 400 mg b.i.d. We also started propranolol 10 mg t.i.d. for anxiety, which worked extremely well for him. He asked to go off Ambien for sleep and did sleep well with trazodone. He feels that this combination of medicines will

likely work well for him.  He was pleasant with staff, attended groups, required no IM p.r.n.   There is no seclusion or restraint. Consequently, it was determined that he had received maximum benefit from his hospitalization and could allow to be discharged.

(Doc. 7-9, p. 100).

On January 27, 2014, Mr. Tinnon saw Mr. Harvey.  Mr. Harvey stated that Mr. Tinnon "continue[d] to ramble about medications to let me know how much he knows.  Doing about the same but less jittery.  Is compliant on medications.  No other problems reported."  (Doc. 7-13, p. 21).

On March 10, 2014, Mr. Tinnon saw Mr. Harvey again.  (Doc. 7-13, p. 22). Mr. Harvey stated:

Pt. is doing as well as can be expected.  Feels he needs to be taken off Tegretol and begin taking Litihium Carbonate instead.  He plans to talk with Dr. [Lachman] about this next week.  Pt. has been sitting with his elderly grandmother for the past several weeks without any relief.  Finds himself co[o]ped up and needs to get out.  He is sleeping better, and his appearance has improved.   Pressure of speech continues flight of ideas and difficulty concentrating/focusing. Memory is also impaired. . . .

(Doc. 7-13, p. 23).

In April 2014, just six weeks before Dr. Lachman completed a mental health source statement on Mr. Tinnon's behalf (Doc. 7-13, p. 28), Mr. Tinnon told Mr. Harvey that he was feeling "better," "trying to get out a little more," and "sits with his grandmother 4 days [a] week."  (Doc. 7-13, p. 27).  Mr. Tinnon told Mr. Harvey that he was waiting for a disability hearing.  Mr. Harvey explained to Mr.

Tinnon that a judge would "weigh all the facts as to his medical condition and decide if he meets the definition of having a disability.  The fact that I believe he has a disability is my opinion but the judge will call the shot.  [Mr. Tinnon] understands the process."  (Doc. 7-13, p. 27).

This collection of medical records, viewed as a whole, indicate that although Mr. Tinnon's condition worsened periodically, he was stable and was able to maintain employment when he consistently took the proper dosage of his prescribed medications.  (*See e.g.*, Doc. 7-10, pp. 10, 12, 22, 27; Doc. 7-11, pp. 6, 9, 21-22, 25-26, 30, 32, 35; Doc. 7-12, p. 4, 10, 29).  Mr. Tinnon's three hospitalizations were the result of his failure to comply with his regimen of prescription medication.

In January 23, 2012, when Mr. Tinnon was admitted to Mountain View Hospital "for safety, evaluation and treatment of mood disturbances," Mr. Tinnon stated that he takes Neurontin for his bipoloar disorder, but Mr. Tinnon "admit[ted] to noncompliance."  (Doc. 7-9, p. 3).  During his admission, Mr. Tinnon's "mood [was] stabilized with pharmacotherapy and active participation in group therapy, activity therapy and individualized therapy.  He completed Librium detox.  He [is] discharged in [a] much improved condition, denying suicidal ideation, homicidal ideation and perceptual disturbances.  He was compliant with current medication regimen with no complaints of adverse effects."  (Doc. 7-9, pp. 4-5).  Regarding

Mr. Tinnon's prognosis at discharge, doctors recommended "continued treatment on an out-patient basis, medication compliance and development of strong positive support system for favorable outcome." (Doc. 7-9, p. 5).

During the hospitalization that lasted from June 16, 2013 until June 19, 2013, Mr. Tinnon admitted that he had "stopped his medications about a month prior to admission" because he felt like they "did not help [him]." (Doc. 7-9, p. 64). After a few days of treatment with his prescribed medications, the discharge report stated that Mr. Tinnon was:

> [c]ooperative, pleasant white male, logical, goal directed in his thoughts. Normal attention and concentration, mildly pressured in his speech. Hygiene was good. No response to internal stimuli. Alertness and orientation was full. Language use was normal. Reliability was judged to be good. Insight was improved. Risk assessment was increased by mild manic symptoms and 1 prior suicide attempt. Decreased otherwise by his absent suicidal ideation, willingness to continue treatment and increasing mood stability.

(Doc. 7-9, p. 65).[1]

Similarly, at the end of another hospitalization in December 2013 during which Mr. Tinnon was "restarted on Tegretol 400 mg b.i.d" and "propranolol 10 mg t.i.d. for anxiety, which worked extremely well for him," a discharge report stated that:

---

[1] The discharge note stating that Mr. Tinnon previously attempted suicide on one occasion conflicts with Mr. Tinnon's report to Dr. Lachman that he had not attempted suicide. (*See* Doc. 7-10, p. 14).

> [Mr. Tinnon] is awake, alert, oriented x4.  Speech is hyperverbal with excellent fund of knowledge and good vocabulary.  Mood and affect are full range.  Thought process is linear.  Thought content, no auditory or visual hallucinations.  No suicidal or homicidal ideation. Insight and judgment are good.

(Doc. 7-9, pp. 100-101).

Reports from two consultative examiners, Dr. Jack Bentley, Jr. and Dr. Sylvia Colon-Lindsey, indicate that Mr. Tinnon functions adequately when he takes his medications as prescribed.  After he examined Mr. Tinnon on May 2, 2012, Dr. Bentley explained that Mr. Tinnon "would often discontinue his medications when his symptoms seemed to stabilize."  (Doc. 7-13, p. 44).  Dr. Bentley explained that "[t]he use of Depakote has helped to treat [Mr. Tinnon's] rapid cycling mood swings.  (Doc. 7-13, p. 45).  Regarding Mr. Tinnon's mental status, Dr. Bentley reported:

> [Mr. Tinnon's] dress, grooming and personal hygiene were all satisfactory.  There was no evidence of deterioration in his daily living skills.  He easily ambulated about the office area.  The client appeared to be his stated age.

> [Mr. Tinnon] made good eye-to-eye contact.   There was no impairment in his receptive or expressive communication skills.  His tertiary and immediate memories were intact.  The client's mood was reasonably appropriate and his affect was of normal range.  There was evidence of a moderate psychomotor tremor in his upper and lower extremities.  He attributed his symptoms of tremulousness to being a side effect of the Depakote.  The client's mood was cheerful and congruent with his affect.  The claimant was mildly anxious.  He did not appear to be in any significant distress during the interview. There was no evidence of phobias, obsessions or unusual behaviors.

. . .

(Doc. 7-13, pp. 45-46).

Regarding Mr. Tinnon's daily activities, Dr. Bentley stated:

The claimant sleeps poorly.   The client has racing thoughts, significant anxiety and intermittent panic without formal anxiety attacks which occur at night.  He does not attend church.  Mr. Tinnon assists with cleaning his parents' house.  The client has a male friend who also resides at his parents' house and they are helping to refurbish the residence.   The claimant completes his [activities of daily living] without assistance.

(Doc. 7-13, p. 46).

After the examination, Dr. Bentley opined that Mr. Tinnon is "competent to manage funds, should they be awarded."  Dr. Bentley also opined that Mr. Tinnon's "impairment for complex or repetitive tasks would fall in the marked to severe range," and his "impairment for simple tasks would fall in the moderate range."  (Doc. 7-13, p. 47).

Dr. Colon-Lindsey examined Mr. Tinnon on March 7, 2014, three months before Dr. Lachman completed the medical source statement on which Mr. Tinnon relies.  Dr. Colon-Lindsey noted that Mr. Tinnon had "[s]everal inpatient psychiatric hospitalizations with the last one two months ago" and was receiving "[o]utpatient psychiatric treatment with a counselor and medication management." (Doc. 7-10, p. 59).  Dr. Colon-Lindsey reviewed Mr. Tinnon's work history and stated that:

He last worked at a chicken processing plant for one month in June 2013. He stopped working when he quit due to physical issues. He has worked at The Waffle House and Office Max. Either he has been fired or he quit. He has not worked since July 2013 because of multiple relapses and hospitalizations. He is still looking for jobs.

(Doc. 7-10, p. 59).

Dr. Colon-Lindsey described Mr. Tinnon's concentration, persistence, and pace as "good," and he "did not have to be redirected." (Doc. 7-10, p. 59). Mr. Tinnon was "alert and oriented," his mood was described as "feeling good," and his affect was "stable and appropriate to thought content." (Doc. 7-10, p. 60). Dr. Colon-Lindsey found "no evidence of immaturity or childishness." (Doc. 7-10, p. 60). Mr. Tinnon's concentration was "good," his abstract thinking was "appropriate," and his judgment and insight were both "appropriate." (Doc. 7-10, pp. 60-61). Although Mr. Tinnon demonstrated "slight pressure of speech," he did not exhibit evidence of "abnormal communication," and Dr. Colon-Lindsey found "no evidence of loose associations, tangential, circumstantial thinking or confusion." (Doc. 7-10, p. 60). Mr. Tinnon's immediate, recent, and past memory were "good" as was his fund of knowledge and information for current events. (Doc. 7-10, p. 60). Mr. Tinnon told Dr. Colon-Lindsey that he did "a lot of social networking" and other activities on his computer, listened to music frequently, did laundry, took care of pets, loaded the dishwasher, regularly went to the grocery

21

store, and cooked his own meals.  (Doc. 7-10, p. 59).  Mr. Tinnon reported that he provided sitting services to his grandmother "all day."  (Doc. 7-10, p. 59).

Dr. Colon-Lindsey found Mr. Tinnon "is not able to manage his own money due to the frequency of his manic episodes and excessive impulse spending." (Doc. 7-10, p. 61).  Dr. Colon-Lindsey opined that Mr. Tinnon's ability to perform a number of functions is "moderately limited" because of impairments.  (Doc. 7-10, pp. 61-62).  She also stated that Mr. Tinnon's "prognosis is guarded due to multiple relapses."  (Doc. 7-10, p. 61).

Dr. John Schosheim's medical interrogatory and mental health source statement do not warrant remand because Dr. Schosheim is a one-timer reviewer, and he provided little support for his conclusory opinions.   Dr. Schosheim reviewed evidence that Mr. Tinnon's attorney provided to him.  Dr. Schosheim listed bipolar disorder and ADHD as Mr. Tinnon's impairments.  (Doc. 7-13, p. 30).  Dr. Schosheim did not elaborate or explain how the records he reviewed support his opinion.  Dr. Schosheim's medical interrogatory states that Mr. Tinnon has moderate restrictions in activities of daily living, extreme limitations in social functioning, and marked limitations in maintaining concentration, persistence, and pace.  (Doc. 7-13, p. 31).  Dr. Schosheim also noted that Mr. Tinnon experiences "continuous" repeated episodes of decomposition, each of extended duration. (Doc. 7-13, p. 31).

Dr. Schosheim completed a pre-printed mental health source statement like the one Dr. Lachman completed in June 2014. (Doc. 7-13, p. 33). According to Dr. Schosheim, Mr. Tinnon has mild to moderate limitations in his ability to "understand and remember simple instructions," moderate limitations in his ability to "carry out simple instructions," marked limitations in his "ability to make judgments or simple work-related decisions," moderate limitations in "[t]he ability to understand and remember complex instructions," and marked limitations in "[t]he ability to make judgments on complex work-related decisions." (Doc. 7-13, p. 33). Dr. Schosheim indicated on the form that Mr. Tinnon has marked limitations in his ability to "[i]nteract appropriately with the public," extreme limitations in his ability to "[i]nteract appropriately with supervisor(s)" extreme limitations in his ability to "[i]nteract appropriately with co-workers," and marked limitations in his ability to "[r]espond appropriately to usual work situations and to changes in a routine work setting." (Doc. 7-13, p. 33). Dr. Schosheim answered "yes" when asked if Mr. Tinnon's impairments affect other capabilities, but he did not respond to the next question, which asked him to identify those capabilities and how they are affected. (Doc. 7-13, p. 34). In the portion of the form that asked him to "[i]dentify the factors (e.g. the particular medical signs, laboratory findings, or other factors described above) that support" his assessment, Dr. Schosheim wrote: "Can't get along [with] others; can't sustain attention – distractibility →

23

significant.   Mood swings – interfere [with] performance and ability to sustain work." (Doc. 7-13, p. 34).

The ALJ gave little weight to Dr. Schosheim's opinion because it is "based solely on [Dr. Schosheim's] review of some particular documents only and he never personally interviewed, observed or examined [Mr. Tinnon]." (Doc. 7-3, p. 23).   The ALJ also gave little weight to Dr. Schosheim's opinion because it "is inconsistent with other examining treating source records that show [Mr. Tinnon's] mood is stable when compliant with medication." (Doc. 7-3, p. 23).   Substantial evidence supports the ALJ's decision to give less weight to Dr. Schosheim's opinion.  *See Gray v. Comm'r of Soc. Sec.*, 550 Fed. Appx. 850, 854 (11th Cir. 2013) ("The opinions of nonexamining, reviewing physicians, when contrary to the opinion of a treating or examining physician, are entitled to little weight and do not, 'taken alone, constitute substantial evidence.'") (quoting *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985)); *Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987) ("[T]he ALJ may reject any medical opinion if the evidence supports a contrary finding.").

### B.    Substantial Evidence Supports the ALJ's Conclusion that Mr. Tinnon Does Not Meet Listing 12.04.

A "claimant has the burden of proving an impairment meets or equals a listed impairment." *Barclay v. Comm'r of Soc. Sec.*, 274 Fed. Appx. 738, 741 (11th Cir. 2008) (citing *Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991)).

"Listing 12.04 provides that a claimant is disabled if []he has a sufficiently severe 'disturbance of mood, accompanied by a full or partial manic or depressive syndrome.'"  *Id.*  (quoting 20 C.F.R. § 404, Subpt. P, App. 1, § 12.04).  "To meet Listing 12.04 for affective disorders, a claimant must meet the requirements in both paragraphs A and B, or meet the requirements in paragraph C."  *Himes v. Comm'r of Soc. Sec.*, 585 Fed. Appx. 758, 762 (11th Cir. 2014) (citing 20 C.F.R. § 404, Subpt. P, App. 1, § 12.04).  "Paragraph A requires '[m]edically documented persistence, either continuous or intermittent,' of a qualifying depressive syndrome, manic syndrome, or bipolar syndrome."  *Himes*, 585 Fed. Appx. at 763 (quoting 20 C.F.R. § 404, Subpt. P, App. 1, § 12.04(A)(1)-(3)).

The ALJ determined that Mr. Tinnon did not meet or medically equal a Listing 12.04.  (Doc. 7-3, p. 17).  The ALJ concluded that Mr. Tinnon's depression did not "meet the criteria of Appendix 1, dealing with affective disorders" because "[t]he evidence failed to show that the claimant's condition is characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome."  (Doc. 7-3, p. 17).

To make this finding, the ALJ first considered whether the "'Paragraph B' criteria are satisfied."  (Doc. 7-3, p. 18).[2]  "Paragraph B requires that the medically

_____

[2] Although the ALJ did not consider the Paragraph A criteria for Listing 12.04, this error is harmless because Mr. Tinnon must show he meets the criteria in both Paragraphs A and B, and

documented persistent syndrome result in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace, or (4) repeated episodes of decompensation, each of extended duration." *Himes*, 585 Fed. Appx. at 763 (citing  20 C.F.R. § 404, Subpt. P, App. 1, § 12.04(B)).   "Episodes of decompensation are 'exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.'" *Id.* (citing 20 C.F.R. § 404, Subpt. P, App. 1, § 12.00(C)(4)).  "To have a repeated episode of 'extended duration,' a claimant must have three episodes within one year, or an average of once every 4 months, each lasting at least two weeks.'" *Id.* (citing 20 C.F.R. § 404, Subpt. P, App. 1, § 12.00(C)(4)).

Regarding the Paragraph B criteria, substantial evidence supports the ALJ's conclusion that Mr. Tinnon has moderate limitations in activities of daily living, social functioning, and maintaining concentration, persistence, and pace.  Evidence in the administrative record indicates that Mr. Tinnon is independent in his

---

substantial evidence supports the ALJ's finding that Mr. Tinnon does not satisfy Paragraph B. *See Himes*, 585 Fed. Appx. at 764.

activities of daily living.  (Doc. 7-10, p. 59).  Mr. Tinnon reported to Dr. Colon-Lindsey that:

> He provides sitting service to his grandmother all day.  He does a lot of social networking.  He does his own laundry and he also takes care of the pets.  He likes to listen to music frequently.  He also does sweeping and mopping.  He loads the dishwasher, goes to the store, and cooks his own meals.  He works on the computer.

(Doc. 7-10, p. 59).

In "Section B – Information about Daily Activities" of his Function Report, Mr. Tinnon wrote that he was able to "accomplish basic grooming," "read and speak with others online, watch TV on and off," do "more house work, fix dinner . . ."  (Doc. 7-7, p. 42).  Mr. Tinnon indicated that he was able to prepare "canned and microwavable meals . . . [s]andwiches and simple salads."  (Doc. 7-7, p. 44).  Mr. Tinnon reported that he was able to do his own "basic housework including dishes, laundry, cleaning, and trash rem[oval]."  (Doc. 7-7, p. 44).   On the same form, Mr. Tinnon wrote that he "feed[s] the dogs and let[s] them out and back in."  (Doc. 7-7, p. 43).  Mr. Tinnon also stated that he was able to drive "but not unmedicated" and "not when [he has] significant mood flares."  (Doc. 7-7, p. 43).  When Mr. Tinnon experiences a depressive episode, he has trouble dressing, bathing, caring for his hair, and shaving.  (Doc. 7-7, p. 43).  Mr. Tinnon reported that he goes outside "[e]very 1-3 days" and shops "[o]nce a week" for approximately one hour.  (Doc. 7-7, p. 45).  Mr. Tinnon also indicated that his

hobbies are reading and "socializing in text/person." (Doc. 7-7, p. 46). When asked to describe what kinds of things he does with others, Mr. Tinnon wrote, "primarily just talk. Most of this occurs online . . . ," and he "use[s] a PC daily for this purpose." (Doc. 7-7, p. 46).

In contrast to Mr. Tinnon's self-assessment (*see* Doc. 7-7, p. 47), medical evidence suggests that Mr. Tinnon's attention and concentration are "good and he did not have to be redirected." (Doc. 7-10, p. 59). Dr. Colon-Lindsey noted that Mr. Tinnon's ability to "perform activities within a schedule, maintain regular attendance and be punctual within customary occurrence," "interact with the general public," and "respond appropriately to work pressures or changes in the work setting despite impairment" is only "[m]oderately limited." (Doc. 7-10, p. 61).

Substantial evidence also supports the ALJ's conclusion that Mr. Tinnon's three psychiatric admissions (Doc. 7-9, pp. 3-4, 58-65, 69-106) do not constitute periods of decompensation under Paragraph B because none of the episodes lasted "for at least 2 weeks," as the Listing requires. 20 C.F.R. § 404, Subpt. P, App. 1, § 12.00(C)(4). Additionally, as the ALJ explained, the episodes involved Mr. Tinnon's noncompliance with prescribed medications, and Mr. Tinnon's condition

stabilized when he resumed his medication regimen. The Court discussed Mr. Tinnon's three hospitalizations above. *See* pp. 14-15; 17-19, *supra*.[3]

Substantial evidence also supports the ALJ's finding that Mr. Tinnon did not satisfy any of the three conditions required for Paragraph C. Paragraph C requires a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support," in addition to one of the following: (1) "[r]epeated episodes of decompensation, each of extended duration;" (2) "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate;" or (3) a "current history of at least [one] or more years' inability to function outside a highly supportive living arrangement, with an

_____

[3] Medical evidence in the administrative record suggests that Mr. Tinnon was admitted for a fourth in-patient psychological consult in February 2012. (Doc. 7-9, pp. 6-11). On February 8, 2012, Mr. Tinnon arrived at Gadsden Regional Medical Center via EMS with an "intentional overdose" after taking "approximately 10 Restoril and an unknown a[m]ou[n]t of liquor." (Doc. 7-9, p. 6). Mr. Tinnon stated that his "medications have gotten his bipolar stable, but his anxiety is not." (Doc. 7-9, p. 6). After an initial assessment, Mr. Tinnon was "admitted and started on close monitoring, IV fluids. Follow up labs. Psych consult." The admission note stated that "[h]opefully [he] will be cleared soon medically to go to the Psych Unit." (Doc. 7-9, p. 11). Although admission notes indicated that Mr. Tinnon would receive a psychological consult, the administrative record does not contain documentation of the psychological consultation. Mr. Tinnon's briefs indicate that he believes he has had three psychiatric admissions since January 2012. (*See* Doc. 10, p. 30).

indication of continued need for such an arrangement." 20 C.F.R. § 404, Subpt. P, App. 1, § 12.04(C).

Regarding the first condition, Mr. Tinnon did not show the required periods of decompensation because his hospital admissions did not last for more than two weeks. (Doc. 7-9, pp. 3-4, 58, 64-65, 70, 100). As for the second condition, medical opinions and evidence indicating that Mr. Tinnon has mild or moderate limitations in activities of daily living, social functioning, and maintaining concentration, persistence, or pace support the ALJ's conclusion that a minimal increase in mental demands or a change in the environment would not predictably cause Mr. Tinnon to decompensate. As for the third condition, the record indicates that Mr. Tinnon was not completely unable to function outside a highly supportive living arrangement. Mr. Tinnon has been independent in his activities of daily living and has provided care for his grandmother. (Doc. 7-7, pp. 42-46; Doc. 7-13, p. 27).

Because Mr. Tinnon's impairments do not satisfy the requirements of either Paragraph B or Paragraph C, substantial evidence supports the ALJ's decision that Mr. Tinnon's mental impairments do not meet Listing 12.04.

## V.    CONCLUSION

For the reasons discussed above, the Court finds that the ALJ's decision is supported by substantial evidence, and the ALJ applied proper legal standards.

Under the applicable standard of review, the Court may not reweigh the evidence or substitute its judgment for that of the Commissioner.  Accordingly, the Court affirms the Commissioner's decision.  The Court will enter a separate final judgment consistent with this memorandum opinion.

      **DONE** and **ORDERED** this October 24, 2016.

_____

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE